IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

DEBORAH J. GOBLE                                                                                PLAINTIFF

VS.                                          CIVIL NO. 04-2120

JO ANNE B. BARNHART,
COMMISSIONER, SOCIAL SECURITY ADMINISTRATION                              DEFENDANT

**MEMORANDUM OPINION**

Deborah Goble ("plaintiff"), brings this action pursuant to § 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the Social Security Administration denying her application for supplemental security income ("SSI") benefits, under Title XVI of the Act.

**Background:**

The application for SSI now before this court was protectively filed on August 29, 2002, alleging an onset date of August 29, 2002, due to pain in the legs, back, and neck; seizures; anxiety; and, depression. (Tr. 130-153). An administrative hearing was held on August 12, 2003. (Tr. 32-101). Plaintiff was present and represented by counsel.

At the time of the administrative hearing, plaintiff was forty-four years old and possessed an eighth grade education. (Tr. 40, 41-42). The record reflects that she has no vocationally past relevant work experience. (Tr. 20, 47-48).

On December 19, 2003, the Administrative Law Judge (hereinafter "ALJ"), issued a written opinion finding that, although severe, plaintiff's impairments did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 21, 28-29). After discrediting plaintiff's subjective allegations, the ALJ concluded that she maintained the residual

functional capacity (hereinafter "RFC"), to lift and carry fifty pounds occasionally and twenty-five pounds frequently; stand and walk for six hours per day; frequently bend and stoop; understand, remember, and carry out simple one or two-step tasks; and, perform work involving no more than incidental contact with the general public. (Tr. 27). With the assistance of a vocational expert, the ALJ then concluded that she was capable of performing work that exists in significant numbers in the national economy. (Tr. 29).

The Appeals Council declined to review this decision. (Tr. 6-9). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned by consent of the parties. The plaintiff and Commissioner have filed appeal briefs, and the case is now ready for decision. (Doc. # 13, 14).

**Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068

(8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schwieker*, 683 F.2d 1138, 1141-42 (8th Cir.1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

**Discussion:**

Of particular concern to the undersigned is the ALJ's conclusions regarding plaintiff's RFC. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003). "Under this step, the ALJ is required to set forth specifically a claimant's limitations and to determine how those limitations affect her RFC." *Id*.

In the present case, the ALJ determined that plaintiff could perform medium work, limited only by her ability to frequently bend and stoop; understand, remember, and carry out simple one or two-step tasks; and, perform work involving no more than incidental contact with the general public. (Tr. 27). However, the medical evidence clearly reveals that plaintiff was suffering from a diffuse bulging disc at the C4-5 level with some mild central narrowing, left paracentral disc protrusion/herniation and central canal narrowing at the C5-6 level, and small protrusion at the C3-4 level with no significant

central stenosis. (Tr. 366-367).

The pertinent medical evidence reveals the following. On September 16, 2002, Dr. Terry Hoyt diagnosed plaintiff with cervicothoracic, thoracolumbar strain; somatic dysfunction; posttraumatic stress disorder with associated generalized anxiety disorder; and seizure disorder, per history. For this, he prescribed Tegretol, Alprozolam, Lexapro, and Bextra. (Tr. 242).

Progress notes dated September 19, 2002, indicate that plaintiff was treated by Dr. Hoyt for musculoskeletal strain and somatization disorder. (Tr. 241). At this time, he prescribed osteopathic manipulative therapy, exercises, and Lorcet. (Tr. 241).

Emergency room ("ER") records from January 4, 2003, reveal that plaintiff had fallen off of her bed the week before, during a seizure, and had injured her right arm. (Tr. 376). She stated that the pain felt like a "toothache." The doctor prescribed Demerol and Phenergan injections, as well as Lorcet Plus and Robaxin. He then scheduled her for an MRI and diagnosed her with cervical radiculopathy. (Tr. 376).

On January 5, 2003, plaintiff complained of right shoulder and arm pain. (Tr. 372). Following a second diagnosis of cervical radiculopathy, she was given injections of Stadol and Phenergan, and released home with instructions to return the following morning for her MRI. (Tr. 372).

On January 7, 2003, plaintiff reported to Sparks Regional Medical Center in Fort Smith, Arkansas, complaining of right shoulder pain and a possible blood clot. (Tr. 368). She rated her pain as a ten on a ten scale. Following an examination, plaintiff was diagnosed with right shoulder pain and gastroenteritis. For this, she was given an injection of Demerol, as well as a prescription for Lorcet Plus. (Tr. 368).

On January 8, 2003, an MRI of plaintiff's cervical spine revealed diffuse disc bulging at the C4-5 level with some mild central narrowing, left paracentral disc protrusion/herniation with central canal narrowing at the C5-6 level, and a small protrusion at the C3-4 level with no significant central stenosis. (Tr. 366-367). As such, plaintiff was diagnosed with cervical disc disease. (Tr. 365).

On January 9, 2003, plaintiff again presented at the ER with right arm and shoulder pain. (Tr. 361). After being diagnosed with chronic pain syndrome, she was given an injection of Toradol, a prescription for Ultracet, and released home. (Tr. 361).

On January 10, 2003, plaintiff complained of pain in her neck and right shoulder, along with numbness in her arms. (Tr. 357). She was given injections of Demerol and Phenergan, diagnosed with chronic neck pain, and released home. (Tr. 357).

This same date, plaintiff sought treatment from Dr. Brackman, due to chronic pain in her right paracervical, right supraspinatus, and right paradorsal regions. (Tr. 291). Plaintiff also reported that the pain radiated into her right upper extremity and down into the arm, forearm, and hand regions. Records indicate that her past treatment had included pain medication, anti-inflammatories, muscle relaxants, and injection therapy. On examination, plaintiff was noted to have a decreased range of motion with pain in her neck, as well as spasm and tenderness in the paracervical, paradorsal, suboccipital, and right supraspinatus regions. Further, her triceps were noted to be weak. Dr. Brackman concluded that her symptoms were compatible with spastic torticollis[1] or a fibromyositis

---

[1]ST, also known as cervical dystonia, is characterized by neck muscles contracting involuntarily, causing abnormal movements and posture of the head and neck. *See* Dystonia Medical Research Foundation, *Cervical Dystonia*, at www.dystonia-foundation.org.

condition[2] in her cervical, upper dorsal, and right shoulder region. He also surmised that she might have a nerve impingement in this region, as she did have radiculopathy into the right upper extremity. Therefore, Dr. Brackman opted to inject her paracervical, occipital, and upper dorsal regions with Decadron. (Tr. 292). He then ordered nerve conduction studies, referred her to a Dr. Myers, and prescribed Lorcet and Soma. (Tr. 292).

On January 11, 2003, plaintiff reported increased pain, as well as a blood clot in her right upper extremity. (Tr. 353). She indicated that she was out of her medication. (Tr. 354). The ER doctor diagnosed her with chronic pain syndrome and prescribed Lortab.

On January 15, 2003, plaintiff was treated by Dr. Brackman for chronic pain in the cervical and upper dorsal region of her back, radiculopathy in the shoulders, and upper arm weakness. (Tr. 286). He noted that a cervical MRI performed on January 9, 2003, had revealed a left paracentral disc protrusion/herniation at the C5-6 level, along with central canal narrowing. Plaintiff also suffered from diffuse disc bulging with posterior spur formation at the C4-5 level with some mild narrowing, as well as a small protrusions at the C3-4 and C6-7 levels. A physical examination revealed a full range of motion without restriction or tenderness in her upper and lower extremities. However, there was a great deal of spasm noted in the cervical spine. Manipulation to this area did increase the range of motion and decrease the palpable spasms, but it also increased plaintiff's level of pain. Therefore, Dr. Brackman diagnosed her with degenerative disc disease in the cervical region with some spinal central

---

[2]Fibromyositis, also known as fibromyalgia, is a common condition characterized by widespread pain in joints, muscles, tendons, and other soft tissues. Some other problems commonly linked with fibromyalgia include fatigue, morning stiffness, sleep problems, headaches, numbness in hands and feet, depression, and anxiety. *See* THE AMERICAN HERITAGE ® DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000), at www.yourdictionary.com.

stenosis and a small herniation at the C6-7 level. He also ordered neurosurgical and pain management consultations, along with nerve conduction studies. (Tr. 287, 290).

On January 21, 2003, plaintiff presented at Sparks Regional Medical Center, complaining of three slipped discs in her neck, resulting in neck and shoulder pain. (Tr. 349). She was given a prescription for Tylenol #3, and released home. (Tr. 349).

On January 25, 2003, plaintiff reported to the ER complaining of neck pain and a history of spasms. (Tr. 345). After being diagnosed with chronic neck pain, plaintiff was prescribed Flexeril and Motrin, and sent home to rest. (Tr. 345).

On January 29, 2003, plaintiff again complained of neck pain, stating that she had been choked by her son-in-law the previous evening. (Tr. 340-341). She also indicated that she had a history of disc herniation. An x-ray of her cervical spine was negative for any fractures. (Tr. 344). Therefore, the emergency room doctor diagnosed her with neck pain, and prescribed Lorcet and Skelaxin.

On February 3, 2003, plaintiff presented at the Emergency Room. (Tr. 336). She complained of neck pain. (Tr. 336-337). Records indicate that her pain was exacerbated by movement and relieved by remaining still. (Tr. 337). She was again diagnosed with chronic neck pain and prescribed Lorcet and Motrin. (Tr. 336).

On March 13, 2003, Dr. Michael Standerfer, a neurosurgeon, evaluated plaintiff. (Tr. 405-408). He noted her history of seizure disorder and focal pain in her cervical region. (Tr. 405). His notes indicate that plaintiff's current pain developed shortly after she experienced a generalized seizure. Her primary pain was noted to be in the focal right paracervical and right trapezius muscle regions. Dr. Standerfer acknowledged plaintiff's cervical spine films and MRI results, which demonstrated

multilevel degenerative changes and attendant disc bulging. On examination, he noted a mild limitation of range of motion in the cervical region, but no reflex asymmetry, sensory impairment, or motor impairment was identified. Dr. Standerfer then noted that radiographic studies, taken in his office, revealed multilevel cervical spondylosis. As such, he did not recommend surgical treatment. He was of the opinion that cervical spondylosis/degeneration could be the underlying source of her pain. Therefore, Dr. Standerfer recommended further evaluation via myelography and post myelogram CT scanning to search for evidence of overt nerve root encroachment or cut off on the right side. He also advised plaintiff to undergo an electromyography to more fully and completely evaluate her situation. Dr. Standerfer did note that plaintiff would be at a slightly higher risk for a seizure following her myelogram. As such, he stated that her Tegretol level should be checked prior to the myelogram to determine whether she would need additional anti-seizure medication prior to the study. (Tr. 406).

On June 16, 2003, plaintiff reportedly slipped and fell head-over-heels down some steps. (Tr. 415). As a result, she reported pain in her lumbosacral and dorsal spine, as well as the back of her pelvis. Dr. Brackman noted that these areas were very tender to the touch, and that plaintiff's movements were hindered by her soreness. Plaintiff also reported continued chronic pain in the cervical and upper dorsal regions of her back, with some radiculopathy in the shoulders and upper arm region. A physical examination revealed spasms and tenderness throughout the paracervical region, as well as paradorsal spasms and tenderness. In the lumbosacral region, she had only fifty percent flexion with a great deal of spasms and tenderness. However, her straight-leg-raising and heel-toe walk tests were negative. (Tr. 416). Therefore, Dr. Brackman ordered x-rays of her dorsal, lumbar, and pelvic regions; directed her to see Dr. Howell regarding her prescriptions for Lorcet and Soma;

gave her samples of Bextra; and, prescribed ultrasound, electro galvanic stimulator, and hot/cold therapy. (Tr. 416).

On August 24, 2003, Dr. Brackman completed a physical RFC assessment of plaintiff based on his physical examinations of plaintiff, as well as the results of her January 2003 MRI. (Tr. 424-430). He indicated that plaintiff could sit ten to thirty minutes at a time for a total of four hours during an eight-hour workday; stand and walk one hour each, for a total of three hours per eight-hour workday; occasionally lift and carry up to ten pounds, bend, squat, reach, stoop, and crouch; and, never lift more than ten pounds, crawl, or climb. (Tr. 424-425). He noted no limitations regarding her ability to use her hands or feet for repetitive movement or to finger objects. Dr. Brackman did, however, state that plaintiff should avoid all exposure to unprotected heights and moving machinery, and would have marked restrictions concerning her ability to be exposed to marked temperature changes and humidity, dust, fumes, gases, driving, and vibrations. (Tr. 425).

On October 2, 2003, Dr. Hoyt completed a physical RFC assessment of plaintiff. (Tr. 428-430). He noted that his objective medical findings had revealed chronic paracervical changes with weakness in her upper extremities, as well as tissue texture changes in her thoracic and lumbosacral paravertebral musculature with tender points. (Tr. 430). Dr. Hoyt also stated that plaintiff had experienced previous problems with cervical disc disease but had declined surgery and fusion.[3] He indicated that she now had secondary degenerative joint disease of the cervical spine with thoracic/lumbosacral strain and somatic dysfunction. (Tr. 430).

---

[3] There is, however, no evidence to indicate that plaintiff was ever recommended for surgery or fusion.

As for plaintiff's physical abilities, Dr. Hoyt stated that she was able to sit for ten to thirty minutes for a total of three to four hours per eight-hour workday, stand ten to thirty minutes for a total of one to two hours, and walk one hour for a total of one to two hours per eight-hour workday. (Tr. 428). He also reported that plaintiff could occasionally lift and carry up to twenty pounds, bend, and squat, and could never lift or carry more than twenty pounds, crawl, climb, reach, stoop, or crouch. (Tr. 428-429). Dr. Hoyt noted no limitations in her ability to use her feet for repetitive movement, but did indicate that her ability to use her hands for repetitive movement and to finger objects was limited. He then opined that plaintiff had marked restrictions regarding her ability to be exposed to marked changes in temperature, humidity, and vibrations; moderate limitations concerning her ability to be around moving machinery, dust, fumes, and gases; and, mild limitations regarding her ability to work near unprotected heights and drive. (Tr. 429).

In spite of this evidence, the ALJ concluded that plaintiff could perform medium level work. Rather than consider the RFC assessments completed by plaintiff's treating physicians, Drs. Hoyt and Brackman, the ALJ chose to dismiss their opinions, stating only that their conclusions were in contradiction with their treatment notes. However, after reviewing the entire record in this case, we do not agree with this conclusion. The record clearly indicates that plaintiff suffered from numerous herniated and/or bulging discs in her cervical spine, necessitating repeated treatment for pain. Muscle spasms, a decreased rage of motion in the neck, and radiculopathy into her shoulders and arms were also repeatedly noted. In fact, plaintiff was prescribed Lorcet, Demerol, and Tylenol # 3, all narcotic pain medications, in an attempt to lessen her pain. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (holding that the ALJ is required to consider all the evidence relating to plaintiff's subjective

11

complaints including evidence presented by third parties that relates to: (1) plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions.). As such, it is clear that her condition would impact her ability to perform medium level work. Therefore, we believe that the ALJ's dismissal of the opinions of plaintiff's treating physicians was error. *See Collins ex rel. Williams v. Barnhart*, 335 F.3d 726, 730 (8th Cir. 2003) (holding that a treating physician's opinion is generally entitled to substantial weight). On remand, he is directed to reconsider these opinions. If he has any questions concerning Dr. Hoyt's or Dr. Brackman's conclusions, he should contact the doctor for clarification prior to rendering a final decision. *See Vaughn v. Heckler*, 741 F.2d 177, 179 (8th Cir. 1984) (If a treating physician has not issued an opinion which can be adequately related to the disability standard, the ALJ is obligated to address a precise inquiry to the physician so as to clarify the record).

It is also significant to note that the ALJ failed to rely upon any medical evidence when concluding that plaintiff could perform medium level work. *See Lewis,* 353 F.3d at 646 (holding that an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace). He specifically stated that the RFC assessments prepared by the agency non-examining, consultative physicians were less restrictive than his conclusions. The ALJ then proceeded to reject the RFC assessments prepared by plaintiff's treating physicians. As such, he erroneously substituted his own opinion for that of a medical expert. Accordingly, the case must be remanded for a reevaluation of plaintiff's RFC.

The ALJ also erred in discounting plaintiff's allegations of disabling pain because she had been

treated medically, not surgically, for her impairments. No medical report suggests that plaintiff failed to pursue a valid course of treatment. *Tate v. Apfel,* 167 F.3d 1191, 1197 (8th Cir. 1999). In fact, no doctor had recommended surgery for her conditions. To the contrary, Dr. Standefer, a neurosurgeon, indicated that plaintiff was not a candidate for surgery. (Tr. 405-408). While we are aware of Dr. Hoyt's notation that plaintiff had previously refused surgery for her condition, we can find no evidence to indicate that surgery was ever an option for her. Therefore, we believe that the case should be remanded to the ALJ for further consideration of the medical evidence.

We also believe that the ALJ failed to fully and fairly develop the record concerning plaintiff's mental impairment. On December 6, 2002, plaintiff underwent a mental status examination with Dr. Patricia Walz. (Tr. 253-257). Plaintiff told Dr. Walz that she had been raped by her father when she was fourteen years old. (Tr. 254). Thereafter, she was hospitalized for her depression on at least one occasion. In fact, plaintiff stated that her parents divorced immediately after her rape. Further, she quit school after completing the eighth grade. (Tr. 254). As a result, plaintiff was reportedly able to read the majority of the words in the newspaper, with the exception of the "big words," and could complete a simple job application. However, she needed assistance to complete her social security application and stated that she was not good in math. (Tr. 254). Dr. Walz diagnosed plaintiff with panic disorder with agoraphobia, dysthymia, rule out borderline intellectual functioning, and personality disorder with passive-dependent traits. (Tr. 256). Although she estimated plaintiff's IQ to be between seventy-five and eighty-five, Dr. Walz recommended that plaintiff undergo IQ testing. (Tr. 256-257). However, IQ testing was never performed. Given the fact that plaintiff dropped out of school in the eighth grade and does have limitations regarding her ability to read and resolve mathematical problems, we believe

13

that the ALJ should have ordered a mental consultative examination, to include IQ testing. *See Reeder v. Apfel*, 214 F.3d 984, 988 (8th Cir. 2000) (holding that the ALJ is not free to ignore medical evidence, rather must consider the whole record). If plaintiff's intellectual abilities are borderline or below average, this will impact her ability to perform work-related activities. Thus, on remand, the ALJ is directed to order a mental health consultative examination to determine plaintiff's level of intellectual functioning. *See* 20 C.F.R. §404.151. If, on remand, it is determined that plaintiff's falls in the borderline or below average range, the ALJ must recall the vocational expert and pose a hypothetical question to him that includes plaintiff's proper IQ status. *See Lucy v. Chater,* 113 F.3d 905, 909 (8th Cir. 1997) (holding that even if claimant's borderline intellectual functioning was not of listing-level severity, claimant was entitled to have a vocational expert consider this condition along with his other impairments to determine how it impacts upon his RFC).

The evidence also suggests that plaintiff was seeing a Dr. Knubley for treatment of her seizures during the relevant time period. However, the record contains no treatment records from this doctor. Therefore, on remand, the ALJ should request medical records from Dr. Knubley.

**Conclusion:**

Based on the foregoing, we reverse the decision of the ALJ and remand this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

DATED this the 15th day of August 2005.

/s/ Beverly Stites Jones
HON. BEVERLY STITES JONES
UNITED STATES MAGISTRATE JUDGE